# EXHIBIT A

## AFFIDAVIT OF KELLEY BLOOD

I, Kelley Blood, being duly sworn, hereby depose and state as follows:

1. I am a Postal Inspector with the United States Postal Inspection Service and have been employed as such since March, 2006. I am currently assigned to investigate financial crimes as a member of the Boston Division Headquarters. My duties include the investigation of various criminal activities, including mail fraud, wire fraud, bank fraud, identify theft and embezzlement.

2. I am aware that Title 18 of the United States Code, Section 1343, makes it a crime for anyone who has devised or intended to devise a scheme or artifice to defraud, or to obtain money or property by means of false or fraudulent pretenses, representations, or promises to transmit or cause to transmit by means of wire, radio, or television communications in interstate commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice. Having so said, I make this affidavit in support of a criminal complaint charging Robert Rego ("**REGO**") with wire fraud in violation of Title 18, United States Code, Sections 1343 and 2.

3. At all times material to this complaint, **REGO** lived in North Dartmouth, Massachusetts.

4. From November, 2002 through at least March, 2005, **REGO** was employed as an account executive at Ameriquest Mortgage Company in Fall River, Massachusetts ("Ameriquest" or "Ameriquest Mortgage"). From at least April, 2005 through 2007, **REGO** was a loan officer at Mortgage Options of America, Inc. ("Mortgage Options of America" or "MOA") in North Dartmouth, Massachusetts.

5. At all times material to this complaint, Long Beach Mortgage Company and Montgomery Mortgage Capital Corporation were mortgage lending businesses that maintained principal places of businesses in California and New Jersey, respectively.

6. The facts stated herein are based on my own personal involvement with this investigation, as well as from information provided to me by other law enforcement officers involved in the investigation. In submitting this affidavit, I have not included each and every fact known to me about this investigation. Rather, I have only submitted those facts which I believe are sufficient to establish probable cause.

## SCHEME TO DEFRAUD

7. Beginning in April, 2005, and continuing through at least June, 2006, **REGO** engaged in a scheme to defraud and to obtain money and property from Long Beach Mortgage Company and Montgomery Mortgage Capital Corporation in connection with the following properties, as described below:

|  | 168 Smith Street New Bedford, MA | 49 Longwood Ave. N. Dartmouth, MA |
|---|---|---|
| **Lender** | Long Beach Mortgage Co. | Montgomery Mortgage Capital Corp. |
| **Purchase Price of Property** | $175,000 | Refinance (total loan amount of $320,000) |
| **First Mortgage** | $140,000 | $256,000 |
| **Second Mortgage** | $35,000 | $64,000 |
| **Mortgage Date** | April 12, 2005 | June 19, 2006 |

## MANNER AND MEANS OF THE FRAUD

### *168 Smith Street, New Bedford, Massachusetts ("Smith Street Property")*

8. In April, 2005, **REGO** orchestrated a foreclosure rescue scheme whereby he caused the owner of the Smith Street Property ("Owner") to sell his property to **REGO**. In the course of the transaction, **REGO** stripped all of the Owner's equity out of the property. To maximize his financial gain, **REGO** left no down payment when he purchased the property. He further obtained 100% financing for the transaction based on an appraised value for the property that far exceeded the Owner's outstanding mortgage balance. **REGO** then quickly sold the Smith Street Property to his colleagues at Mortgage Options of America for an additional profit. The original Owner of the Smith Street Property, however, did not realize a financial gain from the proceeds of the sale of his home to **REGO** or from **REGO**'s resale of the property to **REGO**'s colleagues.

9. In furtherance of his scheme to defraud, **REGO** made material misrepresentations to a mortgage lender, Long Beach Mortgage, in order to obtain favorable financing for the transaction.

10. In particular, in or around March, 2005, REGO communicated with the Owner of the Smith Street Property, who was elderly -- and ill -- and had fallen delinquent on his mortgage payments. **REGO** offered to purchase the Smith Street Property from Owner, to make improvements to the property, and allow Owner to continue occupying the Smith Street Property. **REGO** told Owner that if Owner was able to restore his credit, Owner could repurchase the Smith Street Property at a later date. In actuality, **REGO** resold the Smith Street Property before the Owner had the opportunity to do so.

11. On or about March 21, 2005, **REGO** and Owner signed a Purchase and Sale Agreement for the purported sale of the Smith Street Property to **REGO** at a price of $175,000 (a price far exceeding the Owner's outstanding mortgage balance). **REGO** caused this Purchase and Sale Agreement to be submitted to Long Beach Mortgage as part of the underwriting package.

12. On or about April 7, 2005, **REGO** signed a letter to Long Beach Mortgage stating that he would permanently reside in the Smith Street Property after the closing and that he was "purchasing the home to allow myself the comfort of a larger living space." As **REGO** well knew, he had no such intent to reside in the Smith Street Property. Indeed, **REGO** knew that the original Owner would continue to live there. Rather, **REGO** misrepresented his intent to make the Smith Street Property his primary residence in order to obtain more favorable financing from Long Beach Mortgage as part of his scheme to maximize the equity he could strip out of the property.

13. On or about April 12, 2005, **REGO** signed a loan application for a second mortgage loan in the amount of $35,000, again stating that he intended to occupy the Smith Street Property as his primary residence. **REGO** also signed an Occupancy Agreement further representing that he intended to occupy the Smith Street Property as his primary residence and acknowledging Long Beach Mortgage's reliance upon such representations in granting the financing. Despite these representations, **REGO** never resided at the Smith Street Property.

14. On or about April 12, 2005, **REGO** signed two notes, one for $140,000 and one for $35,000, to purchase the Smith Street Property, and the proceeds were thereupon wired from Long Beach Mortgage to an account held by the closing attorney.

15. The Form HUD-1 for the Smith Street Property transaction, signed by **REGO**, indicated that Owner (*i.e.*, seller) would receive $74,116.11 cash from the sale. While the closing attorney issued a check payable to Owner in this amount, the entire proceeds of the sale of the home (*i.e.*, $74,116.11) were actually deposited to **REGO**'s personal account. **REGO** used approximately $11,000 of these proceeds to make improvements on the Smith Street Property before he ultimately sold it in October, 2005. However, the Owner of the Smith Street Property did not receive any of the cash proceeds from the sale of his home.

16. From at least April, 2005 through at least October, 2005, Owner continued to live in the Smith Street Property and **REGO** made some mortgage payments. But, after only six months, **REGO** orchestrated a scheme to sell the Smith Street Property to a colleague of his in the mortgage industry for an additional profit, thereby allowing **REGO** to obtain even further gains from his purchase of the Smith Street Property.

17. In particular, **REGO** sold the Smith Street Property to Britt Carlson and Christiano Lima, former colleagues of **REGO**'s at Ameriquest Mortgage and Mortgage Options of America, on or about October 5, 2005, for $225,000, (*i.e.*, $50,000 more than what **REGO** had just paid for the property six months prior). As a result of this resale, **REGO** obtained at least an additional $13,000 in profit, and allowed Carlson and Lima to split the remaining proceeds of the sale. The original Owner of the Smith Street Property, however, did not receive any of these cash proceeds. Ultimately, Carlson and Lima made only four mortgage payments in connection with their purchase of the Smith Street Property and the property was foreclosed upon on or about April 16, 2006.

***49 Longwood Avenue, North Dartmouth, Massachusetts ("Longwood Avenue Property")***

18. In June, 2006, **REGO** engaged in a scheme to defraud and to obtain money and property by means of material false and fraudulent pretenses, representations and promises, in connection with mortgage refinancing for the Longwood Avenue Property, which **REGO** acquired in 2004. In particular, **REGO** sought to obtain cash from the equity he had accrued in the Longwood Avenue Property by making material misrepresentations to the mortgage lender.

19. Specifically, on or about June 19, 2006, **REGO** signed a loan application for a $256,000 first mortgage from Montgomery Mortgage Capital Corporation ("MCCC") to refinance his existing mortgage. In the application, **REGO** stated that he earned a monthly income of $18,860, or an annual salary of over $226,000, from Mortgage Options of America. At the same time, **REGO** also signed an Occupancy and Financial Status Affidavit, acknowledging that the lender relied on **REGO**'s representations regarding his income in granting the loan and certifying that the information accurately reflected **REGO**'s current financial status.

20. In reality, **REGO** earned only $53,768 from Mortgage Options of America during the entirety of 2006, as reflected on both MOA's payroll records and **REGO**'s 2008 "Schedule of Financial Affairs" filed with the United States Bankruptcy Court in the District of Massachusetts and signed under the pains and penalties of perjury.

21. MMCC's Combined Underwriting and Transmittal Summary (Fannie Mae Form 1008) reflects MMCC's use of **REGO**'s false income amount to calculate his Qualifying Ratios for the both first and second mortgages.

22. As a result of his refinancing of the Longwood Avenue Property, **REGO** received a check for $43,149.45, which was deposited on June 29, 2006 into a Citizens Bank account in **REGO**'s name.

23. From August, 2006 through August, 2007, **REGO** made approximately ten payments on the loans after which the lender foreclosed on the property on July 24, 2008. The property was eventually sold to a third party for $145,200 in November 2008.

## CONCLUSION

24. Based on the foregoing, I have probable cause to believe that **ROBERT REGO** devised and intended to devise a scheme and artifice to defraud, and obtained money and property from the following mortgage lender by means of material false and fraudulent pretenses, representations, and promises in connection with the purchase of the Smith Street Property and refinance of the Longwood Avenue Property, and did cause writings, signs, signals, pictures and sounds to be transmitted by means of wire communication in interstate commerce for the purpose of executing such scheme and artifice in violation of Title 18, United States Code, Sections 1343 and 2, as follows:

| Count | Date | Property | Lender | Wire |
|---|---|---|---|---|
| 1 | 4/12/05 | 168 Smith Street | Long Beach Mortgage Co. | $141,345.93 wire transfer of funds on behalf of Long Beach Mortgage Co. from Washington Mutual Bank, F.A. in Washington to Citizens Bank in Rhode Island |
| 2 | 4/12/05 | 168 Smith Street | Long Beach Mortgage Co. | $34,532.03 wire transfer of funds on behalf of Long Beach Mortgage Co. from Washington Mutual Bank, F.A. in Washington to Citizens Bank in Rhode Island |
| 3 | 6/23/06 | 49 Longwood Avenue | Montgomery Mortgage Capital Corp. | $254,477.19 wire transfer of funds from Bank of America in New York to Citizens Bank in Rhode Island |
| 4 | 6/23/06 | 49 Longwood Avenue | Montgomery Mortgage Capital Corp. | $63,555.37 wire transfer of funds from Bank of America in New York to Citizens Bank in Rhode Island |

I hereby certify that the foregoing is true and correct. Executed this <sup>th</sup> day of February, 2010.

*Kelley Blood*

KELLEY BLOOD, Postal Inspector
United States Postal Inspection Service

SUBSCRIBED and SWORN to before me
this 16th day of February, 2010.

HONORABLE TIMOTHY S. HILLMAN
UNITED STATES MAGISTRATE JUDGE